JUDGE LINDSAY
delivered the opihioh of the court
The Thornberrys are the joint owners of three hundred acres of land situate in Jefferson County, three miles south of the city of Louisville. The lands lying north and east of the same are owned by Hahn and Harris, the appellants in this appeal.
There extends through the lands of all of said parties, from the north-east to the south-west, a depression or pond, generally known as Lynn’s Pond. The proof as presented by the record warrants us in concluding that the lands of the Thorn *405 berrys were some years since imperfectly drained by tbe flow of tbe water from tbe pond in an easterly direction into Bear-grass Creek, and that about twenty years prior to the institution of this suit a ditch was dug by the Pond Draining Company leading from the western end of the pond into Mill Creek, and that since then the usual flow of the water during the dry season has been through said ditch and into said last named creek. Several years since Hahn and Harris erected dams across the eastern end of said depression for the purpose of forming ice-ponds. The Thornberrys complain that said dams obstruct the natural flow of the water to the east and into Beargrass Creek, and cause it to accumulate upon their lands, thereby rendering almost valueless nearly fifty acres of arable and fertile land. They pray for the removal of the dams, and ask that Hahn and Harris be perpetually enjoined and restrained from again erecting them, or in any other manner obstructing the flow of the water from the pond into said creek. Appellants by their answer deny that the natural or usual flow of the water is to the east, and allege that it is and was to the west through the ditch into Mill Creek, and insist that the appellees are not entitled to the relief sought.
The cause has been carefully and elaborately prepared, much proof having been taken by both the plaintiffs and defendants, and both having had the pond and adjoining lands carefully surveyed and leveled by' surveyors and civil engineers. Upon hearing, the chancellor granted substantially the relief prayed for by the complainants, and Hahn and Harris have appealed to this court asking a reversal of his judgment.
The principles of equitable jurisdiction and relief involved in this appeal have, it is believed, been before this court for adjudication in but one previous case. But in that case (Dumesnil v. Dupont, 18 B. Mon. 800) the power and jurisdiction of courts of equity to afford complete relief in cases of nuisance, whether public or private, was fully recognized. *406 It was held, however, with the English decisions,, that the extraordinary remedy of injunction should be allowed only in cases where the existence of the nuisance was clearly made out upon “determinate and satisfactory evidence.” It may be conceded that in no case will the chancellor interfere by injunction where the nuisance sought to be abated or restrained is eventual or contingent, nor where the evidence is conflicting, and the injury to the public or to the individual complaining doubtful. (2 Story’s Equity Jurisprudence, .section 924; Earl of Rippon v. Hoburt, 1 Cooper’s Selected Cases.)
But where there is “such an injury as from its nature is not susceptible of being adequately compensated by damages at law, or such as from its continuance or permanent mischief must occasion a constantly recurring grievance which can not otherwise be prevented, . . . where the injury is irreparable, or where loss of health, loss of trade, destruction of the means of subsistence, or permanent ruin to property may or will ensue from the wrongful act or erection — in every such case courts of equity will interfere by injunction, in furtherance of justice and the violated rights of the party. . . . The obstructions of water-courses, the diversion of streams from mills, the back flowage on mills, and the pulling down of the banks of rivers, and thereby exposing adjacent lands to inundation, or adjacent mills to destruction,” are all instances in which such relief can be appropriately granted. (2 Story’s Equity Jurisprudence, sections 925, 926, and 927.)
The right of the riparian owner to stop the flow of water upon his own land, and thereby cause it to flow back upon the lands of the proprietor above him, is not a right incident to the ownership of the soil, but an easement which can only be acquired by grant, or by an adverse possession so long continued as to raise a legal presumption of grant. (2 Washburn on Real Property, page 66.)
It is shown by a preponderance of evidence in this case *407 that notwithstanding the fact that during the dry season, and when the water in the pond is low, the flow is through the ditch leading from its western extremity, still that in times of heavy and protracted rains the ditch has not sufficient capacity to carry off all the water accumulating in the pond, and that prior to the erection of the dams at such times much of it did escape by an outlet leading from its eastern extremity into Beargrass Creek; that said dams have measurably closed this eastern outlet, and that in consequence thereof from forty to fifty acres of productive land of great value, the property of the Thornberrys, are periodically inundated, and the crops growing thereon destroyed or greatly damaged; and it appears that so long as the dams are permitted to remain it is reasonably certain that these overflows will continue to recur; and though the crops planted upon the land subject to such overflows may occasionally escape damage or destruction, the uncertainty which must necessarily attend the cultivation of the land, if it does not render it wholly valueless “ or permanently ruin” it as farming land, certainly does very materially interfere with that uninterrupted enjoyment to which its owners are by law entitled. Like the pulling down of the banks of the river, the dams expose or rather render certain the inundation of the adjoining lands.
But the difficulty which presents itself is whether or not the evidence upon which these conclusions are based is “ determinate and satisfactory.” According to the testimony of one, or perhaps two of the engineers, the bottom of the pond upon the lands of Harris, which lie furthest east, is about one 'foot higher than upon those of the appellee’s, and it is argued from this fact that it is improbable, if not impossible, that the water can, under ordinary circumstances, find an outlet in this direction. Many witnesses speak of observing the flow of the water at times when the lands of the Thornberrys were not inundated, and of finding it flowing slowly to the west; and *408 it is insisted with great earnestness that if these facts do not fully rebut the evidence relied upon by the complainants, they at least conflict with the same to that extent which utterly forbids the interposition of the chancellor in their behalf.
We entertain no doubt but that the usual flow of the water from the pond has for many years been through the ditch leading westwardly into Mill Creek. But we think it equally clear that after heavy or protracted rains, when the pond is being rapidly filled by the water falling upon the high lands in its vicinity, that this ditch does not possess sufficient capacity to carry it off as fast as it collects. The surface of the ground lying between the western extremity of the pond and Mill Creek is several feet higher than the bottom of the ditch, and in consequence of this fact the water, failing to find an avenue of escape through this artificial channel, is driven back eastwardly to the natural outlet leading into Beargrass Creek. Plere it meets the dams erected by the appellants, and the necessary and inevitable consequence of these obstructions is the inundation of all the adjoining lands, the surface of which is no higher than the top of such obstructions. Every witness whose attention has been called to the flow of the water at times when the lands of the Thornberrys were thus inundated found it flowing rapidly to the east, and escaping by its natural outlet over and around the dams of the appellants.
Several of them found the surface of the water a foot higher west than it was east of the dams, and when the overflow had subsided it was found that the vegetation which had been swept down by the flood was all leaning to the east, and that the remains of the fences which had been swept away were lodged upon obstructions a considerable distance east of where the fences had stood. These indications are unmistakable, and to our mind far more convincing than the scientific theories of engineers, however ingenious and plausible they may be. A single mistake in the premises upon which their *409 calculations are based — a mistake however trivial it may seem in the calculations through which their conclusions are reached — mistakes which might possibly be made by the most honest and competent — lead of necessity to erroneous conclusions. But nature makes no mistakes; and so long as water continues to obey the laws of gravitation, so long will it be found to flow in that direction in which its level can with certainty be found. In the language of one of the witnesses, “ if the natoal drainage was from east to west, Beargrass Creek would flow into the pond at their point of junction, instead of which it continues eastward to its outlet into the Ohio River at the east end of Louisville.” That the bottom of the pond upon the lands of Harris is higher than upon the lands of the appellees, and the flow of the water to the west in the dry seasons, may be readily admitted, and still this conclusion is not rebutted, nor are those facts necessarily in conflict with that mass of testimony conducing, as we conceive, to establish almost beyond a reasonable doubt that the dams complained of are the immediate and only causes of the frequent inundations from which the lands of the Thornberrys have suffered since their erection. This fact is, we think, proven by evidence not only persuasive, but convincing, “ determinate, and satisfactory.”
Wherefore the judgment of the chancellor is affirmed.