### LAKE ERIE & W. R. CO. v. CITY OF FREMONT, OHIO.

(Circuit Court of Appeals, Sixth Circuit. March 7, 1899.)

No. 607.

1. INJUNCTION—RESTRAINING ERECTION OF NUISANCE—SUFFICIENCY OF EVIDENCE.
    To entitle a city to an injunction restraining a railroad company from constructing an embankment for its tracks, over its own land, across an island in a river, upon the ground that such embankment will increase

92 F.—46

the danger of overflow in times of high water, the probability of such result must be clearly shown. The mere possibility that conditions might be such that the danger would be increased by the embankment is not sufficient to authorize a court of equity to interfere with a use of property which is rightful.

**2.** EQUITY PRACTICE—EFFECT OF FINDINGS OF MASTER.

In dealing with exceptions to a master's report, the conclusions of the master, depending upon conflicting testimony, have every reasonable presumption in their favor, and will not be set aside unless error or mistake clearly appears.

Appeal from the Circuit Court of the United States for the Western Division of the Northern District of Ohio.

This is an appeal from a decree of the circuit court of the Northern district of Ohio, Western division, perpetually enjoining the Lake Erie & Western Railroad Company from constructing a solid embankment of earth, in place of the trestle upon which its track is now laid, across an island in the Sandusky river, within the corporate limits of the city of Fremont, Ohio. The cause was removed from the common pleas court of Sandusky county to the court below by the Lake Erie & Western Railroad Company, a corporation of the state of Illinois; and in the court below the city of Fremont filed an amended bill, to conform to the practice of the federal courts of equity. The averments in the bill set forth the threatened construction of such an embankment, and stated that its substitution for the present trestle would, in times of ordinary high water, flood the water back upon the streets, alleys, and houses of the city; interrupting public travel, and stopping the escape of the sewage, and exposing the residents of the city to disease and great discomfort. The defendant railroad company answered the bill, and specifically denied that the contemplated embankment would in any degree increase the danger from floods to the inhabitants of the city of Fremont. A replication was duly filed, the issues were made up, and the cause was referred to a master to take evidence, and report upon the question whether the building of the proposed embankment would cause the danger as alleged by the complainant in its bill, and whether, if there was any danger from the embankment, it might be avoided by omitting part of it. The master heard the witnesses upon both sides of this question at great length, and returned, with his conclusions and findings of fact, the evidence reduced to writing by a stenographer, amounting in all to 1,650 printed pages. The master's conclusion was "that the building of the embankment across said island in the Sandusky river will not cause the injuries * * * complained of in the said complainant's bill, or any part thereof. * * * If I had any doubt on the subject, I would recommend the construction of a bridge span 120 feet in the clear, similar to that over Front street, located about the middle of the island. Such a span would carry off all ice, that would not otherwise be deflected and carried off by the training dyke formed by the embankment, much better than the present trestlework, and would meet all emergencies; but, as I have no such doubt, I make no such recommendation."

The Sandusky river is a river 60 miles in length, emptying into the Sandusky Bay, an estuary of Lake Erie. The river drains a watershed of 1,200 square miles. It enters the city of Fremont at about the center of the south corporation line, and, pursuing a course somewhat east of north, leaves the corporate limits at the north corporation line, a short distance from the northeast corner of the city proper. It divides the city, with the more populated portion on the west. Fremont contains about 8,000 inhabitants. The main street running east and west is State street, which crosses the river at a point where the water at its ordinary stage is on the level with that of Sandusky Bay and Lake Erie, and is slack water. Sandusky Bay, following the meandering of the river, is 18 miles from Fremont. For a distance of 400 or 500 feet upstream from the State street bridge, at ordinary stages of the water, there is slack water, and no current. Below the State street bridge the river widens out, and at a distance of 1,000 feet divides into two channels. The main channel is the west channel, the east channel being much narrower. The two channels make the island across which it is proposed to build the

embankment in controversy. The Lake Erie & Western road enters Fremont from the northeast, crosses the narrower of the two channels, just referred to, on the bridge, crosses the island upon a trestlework, crosses the west channel upon a wider iron bridge, and then traverses the western portion of the city. The locus in quo may be better understood from the following maps:

PLAT OF
SANDUSKY RIVER
THROUGH
FREMONT, O.

The second map is more accurate, in showing the parallelism of the trestle and the eastern branch of the river, the dimensions of the island, and the length and size of the small bayou on the eastern side of the island, which enters from the north, but does not extend south to the river, as shown in the first map. From a deep dam, 2½ miles upstream, south from the State street bridge, the fall to slack water under the State street bridge is about 22½ feet,

or 9 feet to the mile.  After entering the corporate limits, the first obstruction in the stream is the bridge of the Michigan & Lake Shore Railroad Company. A short distance below this is an old city dam, broken and not in use, and a short distance below the dam is the railway bridge of the Wheeling & Lake Erie road.  There are no obstructions in the stream between that bridge and the State street bridge.  The distance from the Lake Shore bridge to the State street bridge is 2,700 feet.  From the Lake Shore bridge to the dam below it is about 400 feet, and from the Lake Shore bridge to the Wheeling & Lake Erie bridge about 700 feet.  From the Wheeling & Lake Erie bridge to slack water, a distance of about 1,400 feet, the current is quite rapid.  The descent from the surface of the water, at ordinary stage, from the Lake Shore bridge to the State street bridge, is about 5 feet, and from the Wheeling & Lake Erie bridge to the State street bridge about 3½ feet.  The Lake Shore bridge has two spans, with 97½ feet for each span, and an opening in the clear of 195 feet.  There is, in addition to this, what is called a "toe span" of the same width, under which there is dry ground about 6 feet above the surface of the water, at ordinary stage.  The Wheeling & Lake Erie bridge has three spans, of 121 feet each, or an opening of 363 feet.  Both these railroad bridges are built upon solid embankments extending across the valley of the stream. The State street bridge has three spans; the end spans being 85 feet in the clear, and the middle span 140 feet, affording a total opening of 310 feet.  The bridge of the defendant company, in the west channel, 1,800 feet below, consists of four spans, of 132 feet each, with an opening in the clear of 528 feet. The floor of the bridge is 26 feet above the water at ordinary stage.  In addition to the four spans already referred to, there is a fifth span, on the west side, over the Wheeling & Lake Erie Railroad track, which is laid on the top of the west bank of the river.  This span is 120 feet in the clear.  The bridge across the east channel has three spans of 121 feet each, or a total opening of 363 feet.  The bridge across the east branch is placed askew the channel, and the opening for the water at right angles to the current is but 200 feet; making a total opening in the two bridges under which the water passes of 728 feet, at about right angles to the current.  The Wheeling & Lake Erie track on the west bank of the river is about 11 feet above the ordinary stage of the water, and about 5½ feet above the average height of the island opposite; so that, when the river is bank full in a flood, with the water up to the rail of the Wheeling & Lake Erie track on its west bank, the water will be about 5½ feet in depth on the island, on an average.  There are parts of the Third ward of the city of Fremont on the east side of the river, sparsely populated, which are as low as the island, and some very little above it.  The island has an extreme width of about 750 feet, and a length of 2,833 feet.  The east, pier of the west channel bridge is 500 feet from the extreme southernmost point of the island, while the west pier of the bridge over the east branch is 1,800 feet from the same south point of the island.  The length of the trestle from the east side of the bridge over the western channel to the west side of the bridge over the eastern channel is about 1,200 feet.  It is built on a curve.  Just east of the bridge over the west channel, the trestle continues in the same direction as that bridge for about the length of the bridge, and then curves to the northward in such a way as to make the trestle from that point nearly parallel with the east branch of the stream, and but a short distance therefrom.  There are 85 bents in the trestle, which is of wood; each bent being 12 feet wide.  A little less than a mile further down the stream, beyond the bridge across the main channel, and about 2,000 feet below the end of the island, after the river has narrowed considerably, it makes an abrupt bend at right angles to the northeast.  That is called the "First Boyer's Bend."  After running some 2,000 feet, it turns again towards the north, making a second bend between high bluffs.  The second bend is called the "Second Boyer's Bend," and is 1⅛ miles north of Fremont.  The river at Second Boyer's bend is about 350 feet in width.  When, however, the water is up to the level of the Wheeling & Lake Erie track under the bridge over the west channel of the Lake Erie & Western Railroad, the width of water opening at Boyer's Bend is 450 feet.  The surface of the water at ordinary stages is the same under the State street bridge and 600 feet above, under the Lake Erie & Western bridges, and at Second Boyer's bend.  As already de-

scribed, at Second Boyer's bend the highland comes down nearly to the water, so as to make a narrow gateway, not exceeding 500 feet in width at any probable height of the water. The area of space afforded by the bridges for the passage of water when the river is bank full at the Lake Erie & Western bridge (assuming, thus, the column of water to be 11 feet above its ordinary stage) is as follows:

Lake Shore & Michigan Southern.......................... 3,000 feet
Wheeling & Lake Erie.................................... 4,320 feet
State street bridge..................................... 3,516 feet
Two bridges of the Lake Erie & Western.................. 9,136 feet
Boyer's Bend ........................................... 5,910 feet

These figures are made to include the actual depth of water to the bottom of the river at each point.

The action of the water in the river can best be understood at the time of floods by the history which the master gives of the various series of floods as brought before him in testimony. He says: "Many witnesses have testified to the number and character of so-called floods or freshets at Fremont from 1840 to 1897, and also as to the condition of the river and the city at such times, and also as to the formation of ice gorges, and the effect of such gorges. The highest floods in the history of the city occurred in 1883. The water began rising on Saturday, February 2d, and was at its highest point on Sunday, about noon, and gradually receded until the following Sunday, when it was within banks. It left the streets and alleys on the east side, and many streets and alleys on the west side, of the river, obstructed with ice and débris. Front street, the principal business street, had two or three feet of water in it; and men went about in boats through the streets, as well as over vacant lots and the submerged flats south and east of the city. One woman was drowned in her house, which was located some distance north of the Lake Erie & Western bridge. One span of the Lake Shore & Michigan Southern Railroad bridge, 20 feet above the bottom of the river, was washed out, and a number of freight cars went down with the bridge. The water ran over the banks at State street and Ohio avenue, and one freight car was lodged at this point, where the water was four feet deep, and others were carried down through the other bridges to the lowlands, and points away north of the city. Mr. Judson has indicated on the tracing map the surface of the territory that would be affected by a flood, the level of which was 13 feet above datum. A good idea can be obtained of the condition of things in 1883 by adding about 5 feet of water on top of that water datum line. The conditions existing at the time of this unprecedented flood were such that there is no probability of its ever occurring again, although there is a possibility. During the winter immediately preceding this flood there was extremely cold weather, so that the ice had frozen to a thickness of 22 to 24 inches where the water was slack; and the ground, too, was frozen to a great depth, so that it was practically impervious to water. Some time during Saturday, on the 2d, the rain fell, but was of such character that it froze upon the surface of the ground as it fell, until it formed a coating of ice half an inch to one inch thick all over the state of Ohio. Following that there was a very heavy rain and warm weather, which precipitated all of the rainfall into the streams, without any portion being absorbed in the earth. The result was that in all streams in the state of Ohio there was sudden and unexpected flooding, and great damage was done. That flood produced the most serious damage to the city of Toledo, in its history, when the water in the Maumee river rose to the height of 20 feet in a few hours. This is a peculiar combination of circumstances, all of which contributed to the causing of the highest water which had ever been known before by any of the witnesses who testified, and the chances of its repetition are very remote. So-called floods, or extremely high waters, have occurred in Fremont at the following times: February 24, 1862; February 24, 1865; February 24, 1866 (and this flood was the next highest and most disastrous to that of 1883, and water came down Front street, and interfered with the business of the city); on February 16, 1867, great flood; March 7, 1868, high water, which the witness Mr. Hedrick would say was a flood; and on February 12, 1881, there was high water. Some of the older inhabitants also mention a considerable flood in 1846, and another in 1849; and numerous witnesses testified to the fact that in

1884 the river rose so that it overflowed the banks on the west side in the vicinity of May street and Knapp street. The older witnesses say that there is no material difference in the frequency or in the height of freshets and high water along prior to 1880, when the Lake Erie & Western Railroad bridge was built, and since that time. Almost every year when the ice breaks in the spring there are gorges formed at various points in the river. The testimony shows that the river is subject to gorges that affect the flow of the water at nearly all points from a distance above the city, above Ballville, above the Lake Shore Railroad bridge, south of the Lake Shore bridge, south of State street bridge, north of the Lake Erie & Western bridge, but more generally north of State street bridge, in the shallow water at the head of the island. There have been many heavy gorges north of the Lake Erie & Western bridge, beginning upon the right side or east side of the river, on a sand bar that extends out at that point, and running diagonally down the river to the west shore; and there have been some very disastrous gorges, which formed at the first bend, where the river abruptly turns to the west, blocking the channel so completely that the water was forced back until it filled the basin from the foothills on the one side to the foothills on the other. The Wheeling & Lake Erie Railroad track, from the point where it crosses State street and runs into Front street down to the point where it diverges from Front street, running northwest, practically constitutes the bank of the west side of the river. The water has probably risen higher than the Wheeling & Lake Erie tracks at these points four or five times since the year 1883. Sometimes the June freshets have risen higher than the banks, and have covered the island, but usually the waters that are highest are accompanied with ice and the gorging of ice. The flood of 1866 caused a gorge above the State street bridge on the territory that is now south of the Wheeling & Lake Erie tracks. That was before the Lake Erie & Western bridges and trestle were built; and, as the water was practically as high north of the Lake Erie & Western bridge as south of it, I find that the Lake Erie & Western bridges and trestles were in no sense the cause of the disasters that accompanied the floods of 1866 or of 1883. On the contrary, I find that, while the very large volume of water that was precipitated in 1883 would have risen higher than ever in its history before, it was made worse by a gorge of heavy ice that formed at the first bend north of the Lake Erie & Western bridge, spoken of above, and which held the water back for several days to some extent."

From the areas of water opening stated above, the master found that the west channel bridge of the Lake Erie & Western road alone would afford passage for all the water, when unaccompanied by ice, which would possibly come down within the channel of the river under the bridges above, and which would pass out, at second Boyer's bend, of the basin, which is made between the hills. The water rises upon the island, not by reason of the wave of downward flow in the river from the south to the north, but it rises gradually on all sides of the island, and especially from low points on the east and west sides north from the bridge by reason of the filling up of the bottoms and the river below, between the island and second Boyer's bend. The master found that in such floods there was practically no current over the island, that a strong current was in the two channels to the east and west of the island, and that the slight current upon the island was sometimes in one direction, and sometimes in another, by reason of an eddy forming at the north end of the island by the confluence of the two channels of the river at that point. The February freshets are usually accompanied by ice. By reason of the slack water under the State street bridge and below, the ice freezes quite thick, and in some of the shoal places freezes to the bottom. As the loose and broken ice is brought down through the narrow and more rapid part of the stream, and strikes the slack-water ice, there is a tendency to form gorges; and the contention of the complainant was and is that these gorges form, and are in the habit of forming, to a great height, at the piers of the bridge over the west channel, and at the piers of the bridge over the east channel of the defendant company; that these gorges make tight dams reaching up above the banks on the west and east side of the river, so that the only escape for the water is through the trestlework upon the island, which a solid embankment would entirely prevent, and thus greatly increase the flood of the water back upon the lower part of

the city. The master found that ice gorges form at the shoal places in the river, that the water under the bridges of the defendant company was deeper than it was above or below, and that the formation of a gorged dam at either bridge was very improbable. The master said: "The testimony is clear that the gorges usually begin to form north of the State street bridge, at the shallow ground above the head of the island; that they then break up and move out as the water rises, pile up higher as the ice accumulates; but that they finally move down the river, sometimes passing out at one channel, sometimes the other. Sometimes the gorge begins when the thick ice below State street breaks in wide cakes, and floats down to the west bank, and swings around against the piers of the west bridge, and thus holds back the ice that follows. Usually such gorges as these pass out before the water rises as high as the island; but the proof is that the gorges that hurt form on the sand bar that puts out from the island on the north side of the bridge, and resting against the thick ice from the dam, with its points of resistance running downstream, laterally to the opposite bank. And at such times that portion north of the bridge fills with field ice, and backs up to the bridge, where the piers fortify the points of resistance; and then the ice is gorged and forced up against the piers upon the banks and on the head of the island, and the accumulating ice floats around to the east channel, and fills it with field or floating ice; and the gorges that do most harm form at or below the docks, and near the point where the river turns at almost right angles to the west. The proof shows that such a gorge formed there in 1866, and in 1883, and that it was so dense and firm that the main body of water passed over Rawson's flats, north of the Port Clinton or Dock road, to Boyer's second bend, the only and direct point of exit." Again the master says: "Now, the fact is that sometimes, when the water rises high enough, the ice accumulates in the space south of the trestle and bridges, and, floating on top of the water, rests against the piers and trestle, and that sometimes it fills this space, but does not extend over the island beyond the north end of it. * * * It is absurd to suppose that ice would pass through the narrow spaces between the bents of the trestle and such openings, further limited by their diagonal position with respect to the course of the supposed current, and where the surface of the island must always be about ten feet higher than the bottom of the river, and that the ice would not pass through the space afforded by four to six spans, when the smooth stone piers are from 132 to 120 feet apart, and where the water would be ten feet deeper than it is on the island. My conclusion is that the building of the embankment would not increase the liability of the formation of the gorges, but would rather diminish such liability. When we consider the construction of the trestle, and see that the bents are composed of five poles or piles, and that these bents are twelve feet wide, and distant from each other only fourteen feet, that the line is almost parallel with the east channel, and that, in the perspective shown by looking along the line of the trestle, the south end of each bent seems to overlap the north end of the bent immediately beyond it, it will be seen that it is especially well formed to retain any ice that may float against it,—much more so than a smooth and solid bank of earth, even if it be rip-rapped with stone,—and that such a solid bank would facilitate the release of any floating ice that may reach it, and deflect it into the deeper channel, where it will be carried away. To refute this argument, reference is made to the evidence of witnesses who say that in the flood of 1883 a continuous gorge formed along the line of the bridges and island trestle, and remained there over Sunday and the greater part of Monday and Tuesday. No doubt, there was some ice resting against the line at some places, but they are mistaken in supposing that there was a continuous gorge. In 1883, at the time when it is said the ice gorges were largest, at 10 or 11 o'clock on Sunday, the 2d of February, parties passed through under the west span of the Lake Erie & Western bridge, in clear water, clear of ice gorges; and they say the western spans were clear, except floating ice. When it was highest, a number of freight cars from the Lake Shore bridge passed under all of the other bridges, and went away down the river, where they lodged. A stereoscopic view (being Exhibit No. 23), which was taken on Monday, when the water had fallen about two feet, shows the entire line of bridge and trestlework clear of ice, except some floating cakes. The confined basin south of the Lake

Erie & Western bridge, no doubt, gets filled up with ice that floats down against the trestle and against the piers, and, being pressed by more ice from above, soon fills this space, and thus presses it up on the sides of the banks, and on the island above the water level; but there is never a time when the greater volume of water does not pass under, over, or through this ice. * * * The second point relied upon is stated in certain hypothetical questions put to adverse witnesses by complainant's counsel: First. If both the west channel and the east channel are filled with ice, so that no water passes through, would not the island then afford the only outlet for the water and ice? It is erroneous to assume that there is ever a time when there is no water passing through the channels. It either goes under or over the ice below, and, when the water rises to a height that would overflow the banks, the channels are not filled, and the trestlework open."

The learned judge on the circuit sustained the exception to the master's report, as to his conclusion of fact. The court said in the course of the opinion: "In my judgment, a railroad company should not be permitted to build a dam across a stream of water running through a city, unless it is certain beforehand that the structure will not flood the streets and property of the inhabitants of the city. * * * It was conceded by the learned and always frankly-dealing counsel for the defendant in the very beginning of this case, that if the time should ever come when the spaces between the spans of the bridges across the two ordinary channels would become engorged with ice, and there should be a solid embankment across the island, then it would result in a complete dam across the Sandusky river within the town of Fremont, and might occasion an overflow of its streets, alleys, and property; but his contention was and is that the space ways in the bridges on either side of the island are all-sufficient to carry off the water of the Sandusky river at any time, and that there is no reasonable probability that such an engorgement of these space ways by ice will occur to bring about the disastrous results indicated. I think this proof falls far short of sustaining this contention. There seems to have been a disastrous engorgement in the flood of 1883; and, while it must be admitted that a rarely occurring and exceptional flood should not determine the rights of the parties, depending mostly upon average and ordinary conditions, we cannot overlook the circumstance of that extraordinary flood in determining the question we have here, nor what may be a danger of throwing an embankment across the island, when there is only a matter of choosing one form of structure rather than another, and of additional expense in substituting first-class trestles for embankments. The fact that the railroad company has always maintained an open-space trestle across this island is another circumstance that seems to the court to corroborate the contention of the plaintiffs that the closing up of these spaces would endanger the flooding of the town. It is proposed now to make a change in this respect; and it seems to the court that the citizens of the city may well be apprehensive that the change will be detrimental to them, object to it, and insist that the railroad company shall not make the change unless it be certainly shown that there is no danger of unduly obstructing the flood waters. I do not agree with the master that this proof shows such a certainty; nor do I agree with counsel for the defendant that the railroad company has a right to make the change unless the city can show conclusively that the embankment will produce a flood. The danger of a flood is obvious. It is the natural result of damming up the water ways of a stream. It is proposed here to make an embankment, which may become a complete dam by the freezing up and engorgement of the ordinary channels on either side of the island, already partially obstructed by the bridge structures of the defendant company. The physical surroundings and climatic conditions are of a character that indicate danger from ice gorges at the bridge structures and above them. The sluggish, almost dead-water, conditions of the ordinary currents in the Sandusky river thereabouts further indicate that in times of peril by flood every inch of space for carrying off the water is needed. Ordinary prudence demands that as much space shall be left as possible. It is upon the right of the city to insist upon the compliance with the ordinary rules of prudence, and upon its reasonable apprehension of danger from obstruction of the natural flood ways, either around the island or over it, that the maintenance of this injunction depends, rather than any estab-

lished certainty that a flood would occur if this embankment were constructed. Too heavy a burden is sought to be put upon the plaintiff, when it is contended that it must be demonstrated by the proof that the flood will take place. It is only necessary to show that there is reasonable danger of its taking place, to entitle the city to this injunction. It is not the fault of the master that the proof in this case, and his consideration of it, have seemingly drifted upon the supposed necessity of demonstrating the occurrence of a flood if the embankment be allowed. But what has taken place before the master, by its very voluminousness, convinces me that the danger of flooding the town of Fremont, by the proposed embankment, does exist. I do not say that the proof shows that floods will occur, but it certainly does not show that they may not occur; and the danger remains the same, whether the conditions shall ever arise that bring about a flood or not. The possible occurrence of such conditions is sufficient, in my judgment, to maintain the injunction. Having reached this conclusion, I do not deem it necessary to specifically rule upon each of the forty-two exceptions to the master's report. The whole controversy turns upon the ultimate conclusion of the master that the embankment will not cause the injuries apprehended by the plaintiff. But, by whatever process of reasoning upon the proof he has drawn this conclusion, it seems to the court only a matter of his opinion agreeing with the opinion of the witnesses who think as he thinks about the effect, under the laws of hydraulics, of the conditions found in the proof. The master may be right about this, but he also may be wrong; and the danger that he may be wrong is shown abundantly by the testimony of other witnesses, who disagree with those whom the master believed. And so I say again that the very existence of the conflict of opinion demonstrates the danger, and that is sufficient to maintain this injunction."

W. H. H. Miller and James Hunt, for appellant.

B. S. Garver and George Kinney, for appellee.

Before TAFT and LURTON, Circuit Judges, and CLARK, District Judge.

TAFT, Circuit Judge (after stating the facts as above). Were the city to be flooded by reason of the erection of the embankment by the defendant railway company upon the island, the municipal corporation and the private persons injured would have an action against the defendants, which at common law would have been trespass on the case for a private nuisance. In English courts of equity it was, for a long time, laid down as a rule in such cases that until the right of the complainant was definitely established by an action at law the extraordinary remedy of injunction would not be granted by the chancellor. Carlisle v. Cooper, 21 N. J. Eq. 576. The strictness of this doctrine has, in modern years, considerably abated, especially in this country; and where the right to object is clear, and the injury threatened is obvious and clearly proven, injunction has been deemed a proper remedy, even without a judgment at law, to prevent an injury which in its nature would be irreparable, and not to be adequately compensated in damages. It is clear, and, indeed, is admitted, in this case, that if the erection of the embankment as proposed will substantially add to the flooding of the waters over the streets, alleys, and houses of the city in times of freshets or flood, the injuries threatened are, within the meaning of the law, irreparable, and not to be adequately compensated in damages. But it is well settled that an injunction does not issue in such cases unless the probability of danger is clearly shown, and the existence of the nuisance clearly made out upon determinate and satisfactory evidence, and that in no case will the chancellor interfere by in-

junction where the nuisance sought to be abated or restrained is eventual or contingent, or where the evidence is conflicting, and the injury to the public, or to the individual complaining, doubtful. Hahn v. Thornberry, 7 Bush, 403; Story, Eq. Jur. § 924; Dumesnil v. Dupont, 18 B. Mon. 800; Ronayne v. Loranger, 66 Mich. 373, 33 N. W. 840; Blatchford v. Dock Co., 22 Ill. App. 376; Hutchinson v. Thompson, 9 Ohio, 52; Avery v. Fox, 2 Fed. Cas. p. 245 (No. 674); Thornton v. Grant, 10 R. I. 477; Railroad v. Ward, 2 Black, 485; Spangler v. City of Cleveland, 43 Ohio St. 526, 3 N. E. 365. No different rule is laid down in City of Dayton v. Robert, 8 Ohio Cir. Ct. R. 649, upon which complainant relies, because the case there was heard upon a demurrer to the petition, and did not involve the question of burden of proof. In this case the defendant company is conceded to be the owner of that part of the island upon which its trestlework stands. In ordinary stages of water the trestlework stands upon dry land. The island has upon one side of it a channel varying from 300 to 500 feet in width, and on the other side a channel varying from 200 to 250 feet in width. Before the city can obtain an injunction preventing the railroad company from using its own land as it chooses, we are of opinion that the burden is upon the city to show clearly that the erection of the proposed embankment will probably increase materially the damage which floods in the stream always do to the streets and alleys and some of the houses thereof. An examination of the opinion of the court below in sustaining the exceptions to the master's report seems to show that the court regarded the burden of proof as upon the defendant to show that the erection of the embankment would not injure the city. In this, it seems to us, the court erred. A refusal of a perpetual injunction in this instance does not estop the city, or any of its inhabitants, from bringing an action at law to recover damages and to abate the nuisance, if the erection of the embankment hereafter prove to be injurious. At least, such effect may be avoided by inserting the words in the decree, as the defendant suggests, that the refusal to grant the injunction shall be without prejudice to any action at law which may thereafter be brought in respect of damages arising from the embankment, and to abate the alleged nuisance. The master was several weeks in taking the evidence upon the one point in issue. The evidence was all oral. The witnesses came before the master. He, after frequent examinations of the locus in quo, had a much better opportunity than the court below or this court to judge of the weight to be accorded to the evidence of each witness. It is a settled rule in the federal courts that, in dealing with exceptions to a master's report, the conclusions of the master, depending upon conflicting testimony, have every reasonable presumption in their favor, and are not to be set aside or modified unless there clearly appears to have been error or mistake on his part. Tilghman v. Proctor, 125 U. S. 136, 8 Sup. Ct. 894; Crawford v. Neal, 144 U. S. 585, 12 Sup. Ct. 759; Furrer v. Ferris, 145 U. S. 132, 12 Sup. Ct. 821; Davis v. Schwartz, 155 U. S. 631, 15 Sup. Ct. 237; Third Nat. Bank v. National Bank, 30 C. C. A. 436, 86 Fed. 852; The Cayuga, 16 U. S. App. 577, 8 C. C. A. 188, and 59 Fed. 483.

The first issue of fact before the master was whether the erection of the embankment would increase the height of water, during any flood without ice, which was likely to come down the river, so as to throw it back further upon the streets and alleys of the city. He found that the water way under the two bridges was more than three times what it was under the Lake Shore bridge, more than double what it was under the Wheeling & Lake Erie bridge, and considerably more than double what it was under the State street bridge, and that, although the flow of the water under the Lake Shore and Wheeling & Lake Erie bridges would be more rapid than that under the defendant railway company's bridges, the increased head of water below State street would increase the speed of the flow under defendant's bridges, and there would not be the slightest danger that the water would be retarded or its height raised thereby. We have examined all the evidence on this point, and, even if there were no master's finding in the case, we should certainly reach the same conclusion. A most cursory examination of the map, with a knowledge of the conditions which exist as to the rapidity of the current and depth of water, makes this an inevitable conclusion.

The only serious question which arises on the evidence is whether there is any reasonable probability that, in times when the floods are accompanied by ice, the ice will so gorge under the two bridges of the defendant company as to form a dam, from behind which the water can only escape by flowing over the island. The most disastrous flood in the history of the river, except that of 1883, was in 1866, before the bridges of the defendant company were erected. In that case a gorge of ice was made at a point several hundred feet south of the Lake Shore bridge, and the water, overflowing the banks of the river, was thrown into Front street, and flowed thence down into the lower business part of the city, lying along the bank of the river on the west side. Another gorge was formed at the first Boyer's bend, about a half mile below the northernmost point of the island; and the bottoms to the west of the river and to the north of the inhabited part of the city were all covered with water. In the flood of 1883, which was the highest flood in the history of the city, the first gorge was formed a few hundred feet north of the State street bridge. As the ice coming down the river struck the anchor ice, which was frozen to the bottom of the stream, in the shallow and slack water at that point, the gorge was of sufficient height and strength to hold back the water for a short time, so that the level of the water below the gorge was higher than that above it. But as the water came down in greater force the gorge broke away, and was carried under the defendant's bridge down to the First Boyer's bend, where another gorge was formed, of great height and strength. The water rose 5 feet higher than it ever had risen before, to a point 18 feet above the datum, an arbitrary point fixed by the city authorities, being about 1 foot below the surface of the water at ordinary stage under the bridge of the defendant. There is much evidence adduced by the complainant to show that there was a heavy gorge under both of the defendant's bridges, and that this gorge extended across both bridges and across the trestlework, and banked up the water so that it

was a number of feet higher on the south side than on the north side. The master finds that the witnesses to this condition of affairs did not have the opportunities for observation. We have examined the evidence with care upon this point, and we agree with the master that there were no such gorges as are described by the witnesses for the complainant at the two bridges, and at the trestlework, in the flood of 1883. The circumstances which the master cites to show the fact to be otherwise seem to us conclusive upon this point. The evidence of persons who went under the bridge in boats; the fact that freight cars during the high water were carried down the river, and passed between the piers of the west bridge, across the main channel; the fact that the photograph taken the next day after the highest point of the flood discloses no such gorge,—are not to be overcome by the indefinite statements of witnesses, many of them not yet more than 40 years old, as to an event 14 years before, especially when those witnesses are expressly contradicted by older and more experienced observers. It is perfectly clear, and it seems to us that the master demonstrates it, that the flood of 1883 was caused by the fact that the water had such huge volume that it could not escape from the second Boyer's bend into the lake levels beyond in time to prevent the flooding of the bottoms and of part of the city. The master finds that the two bridges of the defendant company had no effect whatever in increasing the height of that flood, and we agree with him. It is altogether probable that a trestlework constructed as lightly as this trestlework was, if it had had an ice gorge against it as the complainant's witnesses testify, with a head of water behind it from three to eight feet above the water on the other side, would have been carried away. We think the weight of the evidence clearly supports the finding of the master that such current as there is upon the island is very much less than the current in the main channels during the floods, and that the island is overflowed first at the low places on both sides of the bridge, and is not overflowed by the wave of the flood as it first comes down. The circumstantial evidence upon this point, the absence of any scouring upon the island, the testimony of the witnesses who own and have cultivated the island, it seems to us, entirely justify the finding of the master. Indeed, there is but a single witness who testifies to the contrary among the complainant's witnesses. The other evidence upon which the complainant relies to show the presence of the current upon the island is the existence of a current a long distance away from the island, in the flats on the west side of the river,—a current the existence of which is entirely consistent with comparative quiet of the water upon the island. The truth is that, judging by the flood of 1883, the island does not form the safety valve from floods, as contended on behalf of complainant. The main body of the water passed under the bridges of the defendant, and not over the island, at all times during the flood of 1883; and while there was, doubtless, ice gathered at the piers and on the banks of the stream, this did not interrupt the flow of the water at either bridge. It is true that the master finds, and there is evidence to show, that there is a tendency of the ice to gorge at a point 600 or 800 feet below the gorge on the shoal

sand bar, which runs out from the island, and that this extends across the river, and has a tendency to throw the water out of the channel of the river onto the bottoms to the north and west of the stream, and that this gorge has been known to extend up nearly or quite to the bridge. It was not the case in 1883; nor does the evidence satisfy us that at any time in the history of the river there was a gorge under both bridges of such a size and strength that the water would be prevented from passing on, and would need the island as a mode of escape. All experts agree that the tendency of ice to gorge is at the shoal places, and the water is deeper immediately beneath the two bridges of defendant than at any point a considerable distance above or below. The evidence of the complainant's expert is that, after making measurements and calculations as to the head of water by a formula, the accuracy of which, in conditions here existing, is by no means established, he finds that if the river were bank full, and both channels were contracted by ice gorges closing up one-third of the waterway; the height of the water would be increased $^{84}/_{100}$ of a foot, or 9 inches, and that, if one-half of the remainder of the channels were closed with ice, the water would be raised $1\,^{15}/_{100}$ of a foot. He proceeds upon the theory that the current on the island is the same as in the channels, when the water is above the island. This is unsound. The master found that there was no probability that the channels of the river would be blocked up to the extent of one-third or one-half of the water way. As the water increases, the probability that the gorge will withstand the pressure of the water decreases. The reason why the gorge at First Boyer's bend in 1866 and 1883 remained so long was because the water found an easy outlet through the very low bottoms to the second Boyer's bend below. The evidence does not satisfy us that any gorge under the defendant's bridges across the main or east branches of the river has ever reached such a height and such strength as to require the island as a means for the water to escape. The government engineer, who testified on behalf of the defendant, expressed the opinion that the filling of the trestle and making it a solid embankment, would have the effect of a training dike to carry the water and ice down through the east channel, and would facilitate the passing of the ice, rather than retard it. It seems to us that this is a reasonable view. The danger of flooding a small part of the city of Fremont is, of course, one that should be avoided if possible; but the remote additional injury or damage likely to result from an increase, in a flood of the depth varying from 12 to 18 feet, of an additional foot or 18 inches, is not such a danger as to require the court to depart from well-settled rules of law in determining the rights between a municipal corporation and a railway corporation. It is to be borne in mind that the erection of the embankment upon the island is on the land of the defendant railway company, and that it does not become a wrong until it is shown that it will inflict injury. The maxim, "Sic utere tuo ut alienum non lædas," has no application until the actual or threatened injury is proven. This is not a case of res ipsa loquitur. The learned judge at the circuit treated the embankment as a dam. If it were a dam clear across the river, then the flooding

back of the water to the height of the dam from the sides of the stream would be an inevitable physical result. But the error is in the assumption that the embankment is a dam. There are two channels, on each side of the embankment, with greatly more water way than is given by the bridges above, or by the banks of the river at Boyer's bend below; and the only possible way in which the embankment can become a dam is by its continuation through the formation of ice gorges across both channels of the river at the same time to the height from the bottom of the river of at least 12 feet. The evidence does not satisfy us that this is probable, or, indeed, that it has ever happened. The mere possibility that it may happen is a contingency which does not justify the extraordinary remedy of an injunction. It would seem to us to be, if it did happen, so remote a natural cause as to come within the class of contingencies known as "acts of God." The learned judge at the circuit regarded the fact that the railroad company has always maintained an open-space trestle across the island, as conduct signifying its fear that a solid embankment would be productive of injury. A much more satisfactory reason for the present open trestle, it seems to us, is found in the circumstance that the cost of a wooden trestle was at the time of its erection very considerably less than the cost of filling with the necessary masonry and rip-rap work. The basis for the conclusion of the learned judge at the circuit is found in these words from his opinion:

"I do not say that the proof shows that floods will occur, but it certainly does not show that they may not occur; and the danger remains the same, whether the conditions shall ever arise that bring about a flood or not. The possible occurrence of such conditions is sufficient, in my judgment, to maintain the injunction."

We cannot concur in this view of the law. We think the danger must be shown to be probable, and not merely possible, where the remedy by injunction is sought to be enforced. The decree of the court below granting the injunction is reversed, at the costs of the appellant, with instructions to enter a decree dismissing the bill for an injunction, without prejudice to the right of the complainant, should circumstances arise in the future justifying it, to bring an action at law, either for damages, or to abate a nuisance arising from the erection of such embankment.